## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 09 2016, 9:08 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Brendan K. Lahey
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent Child Relationship of

B.B., N.B., J.B., and D.B., (the Children)

and

N.B. (Mother)

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

March 9, 2016

Court of Appeals Case No.
71A05-1508-JT-1178

Appeal from the St. Joseph Probate Court

The Honorable James Fox, Judge

Trial Court Cause Nos.
71J01-1405-JT-55
71J01-1405-JT-56
71J01-1405-JT-57
71J01-1405-JT-58

**Bradford, Judge.**

# Case Summary

[1]      Appellant-Respondent N.B. ("Mother") appeals the termination of her parental rights regarding her four children B.B., J.B., D.B., and N.B ("the Children").[1] Father's parental rights as to the Children were terminated on June 4, 2014 and are not at issue in this appeal. Mother claims that the trial court's order is clearly erroneous. We affirm the trial court's order.

# Facts and Procedural History

[2]      This case began on November 23, 2009, when DCS filed a petition alleging that B.B. and J.B. were children in need of services ("CHINS"). Before the CHINS proceedings underlying this case began, the Children were the subject of a prior CHINS proceeding and removed twice from Mother's care for truancy and neglect issues. The Children were "returned to the care and custody of their parents in August 2009 with the CHINS case closed," three months prior to the initiation of the CHINS proceeding underlying this case. Ex. A. p. 3.

---

[1] Mother has two other minor children, K.B. and Di.B., who are no longer subjects of this case but were part of the same CHINS proceedings underlying this case.

[3]     Mother does not challenge any of the probate court's enumerated findings, and her Statement of the Facts consists solely of the those findings, which are as follows:

> Findings of Fact:
> 1. [B.B.] was born October 12, 1997 and is 17 years of age;
> 2. [J.B.], was born September 5, 2003, and is 11 years of age;
> 3. [D.B] was born August 19, 2004, and is 10 years of age, and;
> 4. [N.B.] was born August 21, 2006, and is 8 years old.
> 5. All four children were born to [Mother] and [Father].
> 6. [Father's] parental rights were involuntarily terminated as to all four children on June 4, 2014 in the above captioned cases;
> 7. Verified Petition Alleging CHINS was filed on November 23, 2009;
> 8. The petition alleged that in November of 2009, DCS received a report that [B.B.] and [J.B.], the only school aged children at the time, were showing excessive absences at school;
> 9. On November 25, 2009, [B.B.] and [J.B.] were removed from the care of their parents;
> 10. On December 7, 2009, Mother failed to appear at the status conference, was defaulted. And the Court granted the Petition;
> 11. A Dispositional hearing was held on January 21, 2010;
> 12. Mother failed to appear at the Dispositional Hearing…
> …
> 13. On April 15, 2010, the Court…found that mother was not in compliance with the Dispositional Orders;
> …
> 15. On April 15, 2010, DCS also filed Verified Petitions Alleging CHINS regarding [D.B.] and [N.B.] as DCS had received a report that the minor child was wandering away from the home, unsupervised, and the home was dirty;
> …
> 22. On August 19, 2011, DCS received a report of domestic violence between the parents, who had separated, with mother remaining in the family home;

23. Mother was arrested for Domestic Battery, and DCS detained the minor children yet again;

24. New cases were opened for [D.B.] and [N.B.];

25. A No contact Order was entered between mother and all the children;

…

39. On February 13, 2013, a Six month Periodic Case Review Hearing was held, and concurrent plans of TPR [termination of parental rights], Adoption and Relative placement were approved, and the Court set a fact-finding hearing for mother;

40. February of 2013, mother lost her housing at Indiana Avenue, where she'd been living since 2008;

41. Mother stated she did not have money for the utilities that were due for the home, and so she had to vacate the premises, despite the fact she was buying the home on land contract, and her name was legally still on the house;

42. Mother has not returned to the home, or paid the utilities due;

43. On April 25, 2013, Mother entered an admission to an Amended Verified Petition Alleging CHINS. On that same date, by agreement, Dispositional Orders were entered as follows;

> …
> d. Participate in counseling and Maintain an appropriate home;
> e. Demonstrate appropriate parenting when given the opportunity to visit with her children;

…

49. On August 6, 2014, a Permanency hearing was held, and the case plan of TPR, Adoption, and Legal Guardianship for [B.B.] was approved.

50. At that time mother ha[d] [not] demonstrated her ability to adequately care for her children;

…

55. Therapist Julianne Stickney testified that she'd been therapist for [J.B.], and [N.B.] since December of 2013, and that each child has significant issues;

> a. [J.B.] exhibits a great amount of destructive behavior…

b. [N.B.] has some anger management issues, but has responded fairly well to processing his past trauma, changes, and learning self-calming techniques;

…

58. [M]other stopped counseling on her own, stating she felt she didn't need it anymore. Despite an ongoing court order for individual therapy;

59. Mother has not participated in counseling since approximately April of 2013;

60. In December of 2013, mother had still not obtained housing;

    a. DCS agreed it would pay three (3) months worth of rent and utilities at a home in South Bend;

    b. Mother moved into the home but after three months, still did not have employment;

    c. Mother could not pay the rent or utilities and either left, or was evicted from the home;

61. During that time period several reports for abuse and neglect, including truancy, were made regarding the child in mother's care;

62. Mother was assigned a Lifeline case manager to help her apply for jobs, and attend appointments, including visitation;

63. Mother's attitude was generally negative;

64. Mother cited multiple reasons she could not or would not be accepted for employment, including a felony case for battery;

65. Mother was convicted of Class A Misdemeanor battery;

66. Mother had employment for a brief period, at Paar in Elkhart, IN, but she claims she could not maintain that job due to her DCS Court and meeting obligations. She worked there from late April, or early May in 2013, to July 2013;

67. The Court notes that there were only two hearings during this period…

68. Mother claims that since that time she's been unable to find work because she has no vehicle, but also because she would prefer to be a stay-at-home mother instead;

…

72. Mother's sole source of support and housing was her boyfriend, [W.P.];

…

77. Mother has had no parenting time with her children for approximately two (2) years;

78. This is not due to any court order, or DCS barrier, but by her own choice;

79. Mother acknowledged that [K.B.] who was currently living with her was suspended from school;

80. Mother demonstrated little insight regarding her children lamenting "…she cannot go to school and hold his hand";

81. Mother makes sure he is out the door daily, but once out of mother's sight, "it is the responsibility of the school what happens with him";

…

87. [Grandmother] described the relationship between parents (and also home life) with [Father] and [Mother], as chaotic;

…

90. [J.B.] struggles with violent and destructive behavior…

91. [N.B.] has anger issues:

    a. He is responding well to treatment;

    …

92. [D.B.] has shown great improvement;

…

Appellant's App. pp. 42-46.  The probate court found that termination of the parent-child relationship was in the Children's best interests and granted DCS's petition for termination.  This appeal follows.

# Discussion and Decision

## Standard of Review

[4] The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his or her child.  *Bester*

*v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id*. However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id.*

[5] The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id*. Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id*. The probate court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*.

[6] Mother contends that the evidence presented at the evidentiary hearing was insufficient to support the probate court's order terminating her parental rights. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the probate court's decision and reasonable inferences drawn therefrom. *Id*. Where, as here, the probate court includes findings of fact and conclusions thereon in its order terminating parental rights,

our standard of review is two-tiered. *Id*. First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id*. We note that Mother does not challenge the probate court's factual findings and instead challenges only the probate court's conclusions.

[7] In deference to the probate court's unique position to assess the evidence, we set aside the probate court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id*. A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id*. A judgment is clearly erroneous only if the legal conclusions made by the probate court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id*.

[8] In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

> (A) one (1) of the following exists:
>
>> (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
>>
>> (ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
>>
>> (iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-

two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2011).

[9] Mother does not dispute that DCS presented sufficient evidence to support the first and third elements set forth in Indiana Code section 31-35-2-4(b)(2). Mother, however, argues that DCS failed to establish either that (1) there is a reasonable probability that the conditions that resulted in the Children's removal from or the reasons for the Children's continued placement outside of their home will not be remedied, or (2) there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the Children. Additionally, with regard to J.B. and N.B., Mother argues that there was insufficient evidence of a satisfactory plan for the care and treatment of the children following termination.

# I. Conditions Resulting in Removal Not Likely to Be Remedied

[10]  On appeal, Mother argues that DCS failed to establish by clear and convincing evidence that the conditions resulting in the Children's removal from and continued placement outside her care will not be remedied. Mother also argues that DCS failed to establish by clear and convincing evidence that the continuation of the parent-child relationship poses a threat to the Children. However, it is well-settled that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the probate court need only find *either* that the conditions resulting in removal from or continued placement outside the parent's home will not be remedied *or* that the continuation of the parent-child relationship poses a threat to the child. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. Here, the probate court concluded that there was a reasonable probability that the conditions which resulted in the removal of the children from Mother's care would not be remedied[2], and because there is sufficient evidence in the record supporting this conclusion, it is not necessary for DCS to prove or for the probate court to find that the continuation of the parent-child relationship poses a threat to the child. *In re S.P.H.*, 806 N.E.2d at 882.

---

[2] The probate court also concluded that the continuation of the parent-child relationships posed a threat to the well-being of the Children; however, the reasons predicating both conclusions are essentially the same. Because either condition alone is a sufficient, we address only the former.

In order to determine whether the conditions will be remedied, the probate court should first determine what conditions led DCS to place the Children outside of Parents' care or to continue the Children's placement outside Parents' care, and, second, whether there is a reasonable probability that those conditions will be remedied. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*; *In re S.P.H.*, 806 N.E.2d at 882. When assessing whether a reasonable probability exists that the conditions justifying a child's removal or continued placement outside his parent's care will not be remedied, the probate court must judge the parent's fitness to care for the child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re A.N.J.*, 690 N.E.2d 716, 721 (Ind. Ct. App. 1997). The probate court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.*

A probate court may properly consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, a probate court "'can reasonably consider the services offered by [DCS] to the parent and the parent's response to those services.'" *Id.* (quoting *In re A.C.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997)). The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not

change." *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[13] The probate court found, in part, as follows:

> This is an unusual case in that multiple cases have been opened and multiple children have been involved in cases. Two children were ultimately returned to parents. The Court notes that this was an unusual turn of events. This was done after a great deal of testimony and evidence with the understanding that the two children must be watched closely. Those two children (not the subject of these proceedings) were returned to parents (one child to each parent). Father has [not] appeared in this case and his parental rights were terminated for these four children. The trial concerned only the mother as to these four children. The Court notes the findings support that mother has not made substantial improvements.
>
> In fact the evidence clearly and convincingly demonstrates that mother is still married to the father whose rights were terminated. Mother does not have steady employment, or a stable home. She lives with a man married to another woman. Mother is unwilling or unable to control adequately [or] supervise the single child in her care. Mother is not willing or able to accept responsibility for her failures. The child in her care is regularly tardy from school and was suspended at the time of this hearing. Mother has not seen the children for two years other than in this court proceeding.
>
> For those reasons the court finds that there is a reasonable probability that the conditions that resulted in the removal of the children will not be remedied.
>
> * * *
>
> Mother has not demonstrated the ability to comply with the Dispositional Order of the Court. Mother has not demonstrated the ability to obtain gainful employment….Mother has no[]

ownership in her current residence.  In fact mother laments that she is burdened by debt from the home where these troubles began.  Mother is unwilling to recognize the need or the ability to change in a way that would benefit her children.  Indeed [Grandmother] indicated that life was chaotic when [Mother and Father] lived together.  While the situation has improved [Mother] is not able to provide stability, or support for her children.  [K.B.] who now lives with her is failing at school and [Mother] fails to acknowledge this fact.  [Mother] believes that it is up to her child and the school to work together to help her child.

Appellant's App. pp. 23-24.

[14]   The Children were the subject of a CHINS proceeding prior to the instant case due to truancy and neglect issues.  DCS noted that the family has been involved with the CASIE Center[3] for truancy issues since 2004 and have exhibited a pattern of providing "excuse after excuse as to why children are not in school per school attendance guidelines."  Petitioner's Ex. A, p. 22.  In August 2009, the Children were returned to Mother's care and the CHINS case closed.  In November 2009, a new CHINS petition was filed by DCS after B.B. and J.B. again had excessive absences from school, and the two were removed from Mother's care.  In its subsequent Dispositional Order, the probate court ordered Mother to visit with the Children regularly, complete parenting classes, obtain employment, complete an anger assessment and follow corresponding

---

[3] "The CASIE Center (Child Abuse Services, Investigation and Education) is a child advocacy center serving the needs of children and families in St. Joseph County, Indiana." http://www.casiecenter.org/#!what-we-do/c1rcj (last visited February 24, 2016).

recommendations, maintain contact with DCS, and complete a family dynamic assessment. At the three month progress review, the probate court found that mother was not in compliance with the dispositional orders. In April of 2010, D.B. and N.B. were removed from Mother's care after reports that "the minor child was wandering away from home, unsupervised, and the home was dirty." Appellant's App. p. 19.

[15] Since the Children's initial removal from Mother, Mother did little to convince the probate court that the circumstances predicating removal had changed. With regards to Mother's anger issues, it appears that Mother failed to make any significant progress. In October of 2010, Mother threatened DCS workers stating, "that if she loses her children she will go after DCS and the Magistrate before harming herself." Ex. A. p. 56. Case workers reported that Mother initially made some progress in counseling; however, Mother voluntarily stopped participating in counseling despite the court order for individual therapy, and her behavior subsequently deteriorated. Mother and Father separated in June of 2011. On August 19, 2011, Mother attacked Father after Father attempted to pick up the Children for weekend parenting time. According to accounts provided by the Children, Father, and neighbors, "mother was screaming and cursing at father on the street....Mother then flew into a rage, punching and slapping at the father, around his face and head, with her car keys....Father was bleeding from cuts caused by mother during the attack....the police arrested [Mother] for Class D felony Domestic Battery." Ex. A. p. 119. This incident led to new CHINS cases being opened for D.B.

and N.B., and removal, yet again, of the Children from Mother's care. In a later incident, Mother admitted to throwing a brick through Father's car window while Father and D.B. were in the car.

[16] The older children discussed this and other incidents with their CASA workers and reported that "domestic violence against father by their mother was commonplace." *Id*. The Children also disclosed to CASA workers that they had seen "mother engaged in sexual activity with a man, as well as kissing their 17 year old neighbor…in order to show the older boys 'how it was done,'" and "described drug use by their mother with her friends." *Id*.

[17] Mother also had issues maintaining stable financial support for the Children. Despite the probate court's order to obtain and maintain employment and maintain an appropriate home, Mother failed to do so. It appears that during the five-year life of this case, Mother was only employed once for approximately three months, and Mother claimed that she could not maintain that job due to her court-ordered obligations. However, the probate court noted that there were only two hearings during that employment period, one of which Mother did not attend. In February of 2013, Mother lost her housing, claiming that she was unable to pay for utilities. Mother had still not obtained housing by December 2013, at which point DCS agreed to pay for three months' rent and utilities for Mother at a South Bend home. However, at the end of the three-month period, Mother had failed to obtain employment, could not pay rent, and either left or was evicted from the home.

[18]     Mother argues that she prefers to be a stay-at-home mother, and that the probate court's decision to hold her lack of employment against her "violate[d] her fundamental rights to raise her children as she sees fit…." Appellant's App. p. 16. However, as we mentioned above, "[a] court may properly consider evidence of a parent's…failure to provide support, and lack of adequate housing and employment." *McBride*, 798 N.E.2d at 199.

[19]     We also note that throughout the pendency of this case, Mother has habitually neglected the Children and shown a lack of commitment to preserve the parent-child relationship. The Children were initially removed from Mother's care for, among other things, neglectful behavior, lack of adequate supervision, and truancy. Mother failed to acknowledge her responsibility to assure her Children are attending school and instead blames the school. Furthermore, at the time of the probate court's order of termination, Mother had not visited Children in over a year.

[20]     The probate court heard testimony from Family Case Manager ("FCM") Sheila LeSure and guardian ad litem ("GAL") Christine Wrage who both opined that continuation of the parent-child relationships was not in the best interests of the Children and posed a threat to the Children. GAL Wrage testified that during the two years she was involved in the case, Mother was entirely unwilling to comply with orders to obtain employment and housing. Instead of taking responsibility, Mother complained about DCS and blamed FCM LeSure for her being unable to maintain employment. FCM LeSure testified Mother was unable to provide a safe and stable environment for the Children and that she

did not believe the conditions predicating the Children's continued removal would be remedied. FCM LeSure also noted that there was evidence that, in the short time since moving in with her new boyfriend, there had already been incidents of domestic violence and drug use involving Mother.

[21] Accordingly, the probate court did not err in concluding that there is a reasonable probability that the conditions which led to the removal of the Children from Mother's care would not be remedied.

## II. Evidence of a Satisfactory Plan for the Care and Treatment of the Children

[22] Mother argues that there was insufficient evidence to establish the existence of a satisfactory plan following termination for J.B. and N.B. Kimberly Majewski, a family consultant with Kidspeace, testified that J.B. and N.B. had adjusted to their foster home placements and made improvements with their behavioral issues. The probate court stated that the plan for J.B. and N.B. was adoption. Mother argues that there is a lack of evidence indicating that (1) J.B. and N.B's current placement is acceptable and (2) that their current foster parents would consider adoption. Essentially, Mother argues that DCS must find a permanent adoptive home for the children prior to terminating her parental rights. However, Mother provides no supporting authority which stands for this proposition.

[23] This court has previously held that adoption is generally a satisfactory plan.

> A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the children. In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent. Accordingly, a plan is not unsatisfactory if DCS has not identified a specific family to adopt the children.

*In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied* (citations omitted); *see also In re S.L.H.S.*, 885 N.E.2d 603, 618 (Ind. Ct. App. 2008) ("In order for the trial court to terminate the parent-child relationship, the court must find that there is a satisfactory plan for the care and treatment of the child. This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated."). Accordingly, we find that the probate court did not err in concluding that adoption was a satisfactory plan for the Children.

## III. Fitness to Parent

[24] Mother also argues that the probate court's "failure to find her unfit while at the same time terminating her parental rights violates *Troxel v. Granville*, 530 U.S. 57 (2000)… and, alone, is grounds for reversal." Appellant's Br. p. 15. Mother essentially argues that the probate court was required to make a specific finding that Mother is unfit. Mother misinterprets *Troxel*. In *Troxel*, the Court noted that "so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family…." *Id.* at 68. Here, the probate court made it abundantly clear that it found that Mother had not adequately cared for the Children, *i.e.*

was an unfit parent.[4]  Moreover, even if the probate court had indicated that Mother may have been capable of adequately caring for her Children, it found that she has consistently failed to do.

[25]  The judgment of the probate court is affirmed.


Baker, J., and Pyle, J., concur.

---

[4] Mother also cites to Finding 50 in the probate court's order to support the proposition that the probate court found, at one point, that Mother was a fit parent.  "50. At that time mother has demonstrated her ability to adequately care for her children."  Appellant's App. p. 20.  However, based on the context of the finding, it is clear that this is simply a typographical error and the finding should have read 'mother has *not* demonstrated her ability….'  Finding 49 states "On August 6, 2014, a Permanency hearing was held, and the case plan of TPR, Adoption, and Legal Guardianship for [B.B.] was approved."  *Id*.  Finding 50 would be nonsensical if not read in the negative.